***********
The undersigned reviewed the prior Opinion and Award, based upon the record of the proceedings before Deputy Commissioner Ledford. The appealing party has shown good ground to reconsider the evidence; receive further evidence; rehear the parties or their representatives; and having reviewed the competent evidence of record, the Full Commission REVERSES the Opinion and Award of Deputy Commissioner Ledford and enters the following Opinion and Award.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. The parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act at all relevant times.
2. An employer-employee relationship existed between the parties on January 9, 2002.
3. Zenith Insurance Company is the carrier on the risk.
4. Plaintiff was born on August 29, 1960 and was first employed by Callawassie Island Company, L.P. in 2001.
5. The date of plaintiff's alleged injury is January 9, 2002.
6. Plaintiff's average weekly wage and compensation rate may be confirmed by a properly prepared Form 22, pursuant to N.C. Gen. Stat. §97-1 et seq.
7. The following stipulated exhibits were admitted into evidence:
a. Stipulated Exhibit #1: the Pre-Trial Agreement.
b. Stipulated Exhibit #2, subparts A through M: various I.C. Forms, medical records for plaintiff, and plaintiff's responses to defendant's interrogatories.
8. The issues for determination before the Commission are:
a. Whether plaintiff sustained a compensable injury by accident while working for defendants.
b. If so, what benefits is plaintiff entitled to receive under the Workers' Compensation Act as a result of his injury.
 ***********
Based upon all of the competent evidence of record and reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of the Deputy Commissioner's hearing, plaintiff was 43 years of age and completed the ninth grade. Plaintiff worked for Balsam Mountain Preserve, a subsidiary of Callawassie Island Company, L.P. When he first began work in 2001, plaintiff earned $8.00 per hour, which was raised to $9.00 per hour after his review. Plaintiff worked 40 hours per week.
2. Plaintiff worked on a crew that cleared rights-of-way. Plaintiff's crew cut and cleared brush using chain saws and a chipper. The crew cut the brush, then hauled it to the chipping machine for processing.
3. Plaintiff testified that on January 9, 2002, his crew was working on a logging road that had ice and snow on it. The foreman was cutting trees and plaintiff was chipping. Plaintiff went down a steep bank to retrieve an approximately 15-foot long poplar log to be placed in the chipper. The log was whole, with a diameter of 15 to 18 inches. Plaintiff picked up the log, pulled the log up a bank approximately 10 to 20 feet, and fed it into the chipper. As plaintiff was picking up and pulling the log, he realized he pulled "something" and felt pain in his groin and right leg.
4. Plaintiff stated that he did not think he was badly hurt at the time. Plaintiff told Gary Gentry, the crew supervisor and plaintiff's cousin, about his injury that same day. Mr. Gentry did not recall such a conversation on that day. However, the Form 19 prepared by defendants states that defendant-employer first knew of the injury on January 9, 2002. Plaintiff worked the remainder of the day and drove home.
5. During the evening of January 9, 2002, plaintiff's groin and leg pain became worse. On January 10, 2002, plaintiff began working with the crew, but in the mid-morning plaintiff picked up a block of wood that immediately triggered pain in his groin, back and leg. Plaintiff told Mr. Gentry that he could not work because his groin, back and leg were hurting. Plaintiff told Mr. Gentry that he injured himself the previous day while lifting a log. Mr. Gentry called his supervisor, Buddy Salter, who told him to take plaintiff to the hospital emergency room.
6. On January 10, 2002, Mr. Gentry took plaintiff to the emergency room of Harris Regional Hospital, where plaintiff was treated for pain in his right groin. Plaintiff testified that he told the emergency room doctor that he had groin, back and leg pain. The emergency room records, however, do not indicate that plaintiff made any complaints of back or leg pain.
7. Dr. Kent O'Brien, emergency room physician, treated plaintiff for epididymitis. Dr. O'Brien prescribed Cipro, Vicodin and ibuprofen, and told plaintiff to rest and drink plenty of fluids. Dr. O'Brien instructed plaintiff to follow up with Dr. Thomas Ward, his family physician.
8. After plaintiff was released from the emergency room on January 10, 2002, Mr. Gentry took him back to defendant's office to fill out a report for company records. Ms. Micky Norman, defendant's office manager, took the report. Ms. Norman stated that when plaintiff applied for his job with defendant-employer, plaintiff was required to complete a medical questionnaire regarding any surgeries or injuries he had in the previous three years. Plaintiff did not disclose a neck surgery in 1993 and did not indicate that he had any prior back or neck problems.
9. Defendants' land manager, Buddy Salter, was first made aware of the groin injury to plaintiff on January 10, 2002 when Mr. Gentry called him. When they filled out the injury report, plaintiff told Mr. Salter that he injured his groin, but did not mention a back injury. Mr. Salter was unaware until May 2002 that plaintiff claimed he injured his back. Following the groin injury, defendants tried to provide light duty options for plaintiff. Plaintiff continued to perform light duty work until May 15, 2002 when defendants no longer had light duty work available. Plaintiff has not returned to work since May 15, 2002.
10. On January 14, 2002, Dr. Ward treated plaintiff. Plaintiff complained of groin pain. Dr. Ward learned that Dr. O'Brien prescribed plaintiff an antibiotic for epididymitis, but plaintiff did not take it because he could not afford to pay for it. Dr. Ward noted that plaintiff indicated his right groin only hurt when he bended or lifted anything. Dr. Ward assessed a possible right groin muscle pull and on January 21, 2002, referred plaintiff to urologist Dr. Richard Steele.
11. At a January 22, 2002 visit to Dr. Steele, plaintiff's chief complaint was "groin pain and on the right side." Dr. Steele's examination resulted in a diagnosis of acute epididymitis, right and orchalgia, right. Dr. Steele noted that plaintiff had an allergy to sulfa drugs, and continued plaintiff's treatment with Avelox. He instructed plaintiff to avoid strenuous activity for the next three weeks, wear scrotal support, take NSAIDs as needed and take warm baths. He planned to see plaintiff again in one month. On January 29, 2002, plaintiff's wife called Dr. Steele's office stating that plaintiff was still having pain in the back, arms and shoulders. The doctor indicated that plaintiff's epididymitis infection would not cause shoulder and back pain, and referred plaintiff back to his family practitioner, Dr. Ward.
12. On January 28, 2002, plaintiff called Dr. Ward's office to determine if he could see Dr. Ward before his scheduled appointment on January 31, 2002. Plaintiff complained of shoulder pain. Angie Penley, CMA, called plaintiff to follow up. Plaintiff explained that he had been having shoulder pain since his groin injury but he thought it was just arthritis. On January 30, 2002, plaintiff called Dr. Ward's office again, complaining of shoulder, neck and arm pain. Plaintiff did not go to his scheduled appointment on January 31, 2002 with Dr. Ward.
13. On February 7, 2002, plaintiff sought treatment from Dr. Keith Bryson, urologist at Western North Carolina Urology, P.C. Dr. Bryson examined plaintiff and diagnosed "inter thigh and inguinal muscle strain. Right epididymitis starting symptomatically at the same time as muscle strain according to patient's history." Dr. Bryson prescribed Cipro, the same antibiotic that had been prescribed on plaintiff's initial emergency room visit, but which plaintiff did not previously take.
14. On February 22, 2002, plaintiff reported to Dr. Bryson that he was asymptomatic after one week of antibiotics. Dr. Bryson's exam showed no remaining epididymal tenderness or fullness, and he found no tenderness in the thigh area. Dr. Bryson released plaintiff at that time and informed plaintiff that he could return to work on February 28, 2002. Plaintiff did not complain of back pain to Dr. Bryson.
15. On March 6, 2002, Dr. Ward saw plaintiff and noted that he thought plaintiff had a muscle strain in his groin but he was doing better with that pain. At his visit to Dr. Ward on March 13, 2002, plaintiff was concerned about his diabetes. Plaintiff did not make any complaints of back or leg pain to Dr. Ward during that visit.
16. On April 26, 2002, plaintiff saw Dr. Mark Yarborough at Asheville Urological Associates, Inc. According to Dr. Yarborough's medical notes, plaintiff complained of "back pain on the right" and pain in his "private parts." Plaintiff also indicated he had experienced several weeks of pain in his right hip, right inner thigh and right back. Plaintiff associated his pain with several episodes of heavy lifting and stated that he "aggravated things about a week ago." Dr. Yarborough referred plaintiff to Dr. Eric Rhoton.
17. On May 8, 2002, plaintiff sought treatment from Dr. Rhoton, a board certified neurosurgeon at Mountain Neurological Center, P.A. Plaintiff told Dr. Rhoton that he injured himself lifting a log on January 9, 2002 and that he suffered from back pain over the several months since January 9, 2002. Plaintiff described to Dr. Rhoton that on January 10, 2002, the day after his injury, plaintiff had more intense pain in his lower back, more to the right side into the right buttock, with radiated pain into the right groin and leg. After reviewing an MRI, Dr. Rhoton diagnosed a right-sided, L4-5 annular tear and disc protrusion. Dr. Rhoton noted that plaintiff's symptoms and MRI scan were consistent with a work injury related to plaintiff's lifting of the log. Dr. Rhoton also stated that the right-sided disc protrusion would be expected to affect the right side of plaintiff's body.
18. On June 13, 2002, plaintiff saw Dr. Rhoton for continued low back pain. Dr. Rhoton noted that plaintiff's cervical stenosis was secondary to the disc protrusions at the C5-6 and C6-7 level. Dr. Rhoton felt that plaintiff certainly could have developed the cervical stenosis during his lifting injury in January 2002. Plaintiff remarked to Dr. Rhoton that his cervical symptoms were overshadowed by his lumbar pain. Dr. Rhoton discussed treatment options with plaintiff, including chronic pain management, lumbar discography and possible L4-5 interbody fusion, as well as a C5-6 and C6-7 anterior cervical discectomy and fusion. Plaintiff planned to consider his options before going forward with surgery.
19. On August 7, 2002, Dr. Rhoton performed an L4-5 lumbar fusion on plaintiff. Dr. Rhoton noted in his discharge summary that plaintiff suffered from severe degenerative disc disease at L4-5 with right low back, hip, and lower extremity pain. Dr. Rhoton testified that plaintiff had a fairly good recovery from surgery and that both plaintiff's leg and groin pain were resolved.
20. On March 31, 2003, Dr. Rhoton performed a C5-6 and C6-7 anterior cervical diskectomy and fusion on plaintiff. After the surgery, plaintiff experienced relief from his preoperative neck and arm pain and had no further upper extremity numbness.
21. On May 29, 2003, Dr. Jerry Kotulla treated plaintiff for management of his chronic lower back pain syndrome. Dr. Kotulla stated in a letter to Dr. Rhoton concerning plaintiff that "It is quite possible that the groin symptoms he [plaintiff] was experiencing [were] a result of spasms in the psoas muscle irritating the genitofemoral nerve." Dr. Kotulla indicated plaintiff had resolution of his leg symptoms following the L4-5 lumbar fusion. Dr. Kotulla also noted that plaintiff reported he was severely restricted in his daily activities as a result of his neck and back problems. On June 4, 2003, Dr. Kotulla informed Dr. Rhoton that plaintiff was responding well to transdermal medications and that he would cancel other therapies considered for relief of plaintiff's symptoms.
22. As of June 25, 2003, Dr. Rhoton felt plaintiff was unable to work and was permanently disabled with regard to his back and ongoing pain symptoms. If plaintiff continued to require narcotic pain medication, Dr. Rhoton planned to refer plaintiff to a pain specialist. Also on June 25, 2003, Dr. Rhoton completed an Ability or Disability Certificate for plaintiff, indicating that plaintiff was unable to perform his job duties from January 9, 2002 and continuing permanently.
23. Dr. Rhoton stated the opinion that the lumbar disc condition for which he treated plaintiff was causally related to the January 9, 2002 incident. Dr. Rhoton felt plaintiff did not have any urological problem and that plaintiff's back condition, which was not recognized by the doctors, was the basis of plaintiff's complaints in January 2002. Dr. Rhoton stated further that after "reviewing the full medical record that [plaintiff's] problem all along was this disc tear that certainly his history would fit with it, the symptoms fit with it, and the fact that he got better in relief of the symptoms after the [L4-5 lumbar fusion] seems to all support that." Dr. Rhoton believed that plaintiff experienced the same pain the whole time and that essentially, plaintiff went to the wrong type of doctor to get his initial complaints evaluated. Dr. Rhoton stated that the fact that the discogram reproduced plaintiff's pain and that plaintiff got relief from the surgery support his opinion that plaintiff did not have a urological problem. Dr. Rhoton explained that a torn disc capsule at the L4-5 level could cause referred pain to the groin. In Dr. Rhoton's opinion, "it seems to be very straight forward to me; that this guy has a work-related injury."
24. Dr. Michael Goebel, an orthopedic surgeon, testified that he reviewed plaintiff's records and found there to be insufficient evidence of a causal connection between the incident of January 9, 2002 and the back condition for which Dr. Rhoton treated plaintiff after May 2002. Dr. Goebel stated that patients who have disc problems almost universally complain of back pain at or near the time of any acute injury. Dr. Goebel also testified that the groin pain complained of by plaintiff was not likely caused by any problem with the L4 nerve root for which he received treatment by Dr. Rhoton. After reviewing plaintiff's medical history, Dr. Goebel was of the opinion that it was more likely than not that plaintiff's complaints of lower back pain and lower back condition were not related to the incident of January 9, 2002.
25. The Full Commission gives greater weigh to the testimony of Dr. Rhoton, a board certified neurosurgeon, who was plaintiff's treating physician than to Dr. Goebel who never treated plaintiff. Dr. Rhoton performed both plaintiff's L4-5 lumbar fusion surgery and C5-6 and C6-7 anterior cervical diskectomy and fusion. Dr. Rhoton stated that plaintiff's presentation of pain in his "private parts" was unsophisticated and may have caused other doctors to focus on a groin problem instead of following the symptoms to diagnose plaintiff's back problems. Dr. Rhoton further testified that after reviewing plaintiff's medical records, he concluded plaintiff "had a problem with his back and disc the whole time. It just wasn't recognized."
26. Pursuant to the Form 22, plaintiff's average weekly wage is $309.26, yielding a compensation rate of $206.18.
27. The greater weight of the evidence shows that on January 9, 2002, plaintiff suffered an injury by accident while performing work for defendants. Thereafter, the record indicates plaintiff performed light duty work for defendants from January 10, 2002 until May 15, 2002. Since May 15, 2002, plaintiff has been disabled from any employment.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission reaches the following:
 CONCLUSION OF LAW
1. On January 9, 2002, plaintiff suffered an injury by accident arising out of and in the course of his employment with defendants. N.C. Gen. Stat. § 97-2(6). Plaintiff's back, groin and leg pain are the direct result of and causally related to his January 9, 2002 injury by accident. Id.
2. As a result of the compensable injury by accident, plaintiff is entitled to have defendants pay ongoing total disability compensation, at the rate of $206.18 per week, from May 15, 2002 until such time as plaintiff returns to work or until further Order of the Commission. N.C. Gen. Stat. § 97-29.
3. Plaintiff is entitled to have defendant pay for medical expenses incurred or to be incurred, including plaintiff's lumbar and cervical fusion surgeries, that provide relief, effect a cure, or lessen the period of plaintiff's disability. N.C. Gen. Stat. §§ 97-2(19); 97-25.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the undersigned enters the following:
 AWARD
1. Plaintiff is entitled to total disability compensation, subject to reasonable attorney's fees approved below, at the rate of $206.18 per week, from May 15, 2002 until plaintiff returns to work or until further Order of the Commission. Compensation that has accrued shall be paid in a lump sum.
2. Plaintiff is entitled to have defendants pay all medical expenses incurred or to be incurred as a result of his injury by accident, when bills for the same have been approved in accordance with the provisions of the Act.
3. A reasonable attorney's fee of 25% of the compensation awarded to plaintiff in Paragraph 1 above is hereby approved to be deducted from sums due plaintiff and paid directly to plaintiff's counsel.
4. Defendants shall pay costs and all expert witness fees previously approved.
This the 20th day of April 2005.
 S/______________________ LAURA KRANFIELD MAVRETIC COMMISSIONER
CONCURRING:
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER
 S/_____________ PAMELA T. YOUNG COMMISSIONER